# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CLIFFORD LEWIS STAFFORD,

        Defendant-Appellant.

UNPUBLISHED
August 24, 2017

No. 331835
Wayne Circuit Court
LC No. 15-001184-01-FH

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MARY ANN STAFFORD,

        Defendant-Appellant.

No. 332007
Wayne Circuit Court
LC No. 15-006158-01-FH

Before: SAAD, P.J., and SERVITTO and GADOLA, JJ.

PER CURIAM.

Defendant Clifford Stafford (Clifford) was convicted by a jury of obstruction of justice, MCL 750.505, and acquitted of a false pretenses charge; defendant Mary Ann Stafford (Mary) was convicted by the same jury of false pretenses greater than $20,000, MCL 750.218, and obstruction of justice, MCL 750.505. Clifford was subsequently sentenced to 18 months' probation, while Mary was sentenced to 1 to 10 years' imprisonment for the false pretenses conviction and one to five years' imprisonment for the obstruction of justice conviction. Clifford was additionally ordered to pay a fine, fees, and costs totaling $1,678 and to complete 200 hours of community service; Mary was ordered to pay restitution, fees, and costs totaling $75,198. Both defendants now appeal as of right. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

Defendants were charged with false pretenses based on their sale of a home at 13236 Nautica in Van Buren Township. The prosecution alleged that defendants purchased the

-1-

property from the owners by having two friends, Emmett and Trenise Wyldon, obtain a mortgage loan for the property for approximately $375,000 based on the purported purchase of the property from defendants. Defendants then used the proceeds from the Wyldon's mortgage loan to purchase the property from the actual owners for approximately $312,000. That is, defendant's "sold" the property to the Wyldons before they had actually purchased the property from the owners, and then used the mortgage money the Wyldons obtained to pay the original owners for the property. Defendants and the Wyldons then pocketed the difference between the purchase price paid to the original owners and the amount of the mortgage loan payout.

Defendants were charged with obstruction of justice for their subsequent efforts to blame the property purchase on other unnamed people. The Nautica property went into foreclosure because the Wyldons failed to make required mortgage payments. Defendants then instituted a quiet title lawsuit in an attempt to "recover" the property. In the course of this lawsuit, they filed affidavits in which they tried to obscure their involvement in the fraudulent property transactions, indicating that they had not participated in the closing(s) that occurred on December 5, 2007. The prosecution further alleged that defendants pursued a false criminal complaint in an effort to obscure their involvement in the fraudulent transactions. Defendants claimed that, to the extent a fraudulent sale had taken place, they had not been involved and other individuals— primarily Trenise Wyldon—had committed the fraud.

Admitted at trial were two warranty deeds, both dated December 5, 2007, that showed that the Nautica property was purchased by Private Consumer Consulting Services (PCCS) from the original owners for $312,500, and that the property was then sold to Trenise Wyldon by Mary Ann Stafford, doing business as PCCS, for $395,000. Among the additional documents admitted at trial were: an application by Trenise Wyldon for a mortgage on the Nautica property in the amount of $375,250, dated December 3, 2007; a mortgage for that property issued by Wells Fargo in the amount of $375,250 with the Wyldons as the borrowers and dated December 5, 2007; a settlement statement dated December 5, 2007, prepared by Reliant Title for the closing on the Nautica property listing Trenise Wyldon as the buyer and Mary (d/b/a PCCS) as the seller, with the sales price shown as $395,000, the gross sales amount as $408,390.40, the mortgage loan as $375,250, an entry showing a "contribution" of $10,000 to the purchase, and an entry showing that Trenise was to produce $23,140.93; a document dated December 5, 2007, showing that PCCS provided $311,937 in buyer funds for the property;[1] and a sheriff's deed dated June 24, 2009, for the Nautica property showing the grantee as Wells Fargo and the borrower as the Wyldons. Additionally, a packet of documents was admitted containing the banking records for PCCS, which included a deposit ticket with Mary's name in the amount of $44,195.07 dated December 5, 2007; a check corresponding to the deposit ticket made payable to PCCS from Reliant Title and endorsed by Mary; and a check drawn by Mary on December 14, 2007, in the amount of $7,500 made payable to Trenise, along with a corresponding withdrawal ticket. These documents were offered in support of the false pretenses charges.

---

[1] A cancelled check from Reliant Title to PCCS for $311,937 that was endorsed by Mary was also admitted.

In support of the obstruction of justice charges, documents were admitted showing that a quiet title action had been instituted by PCCS with regard to the Nautica property. Also admitted were sworn affidavits from Clifford and Mary that had been filed with the quiet title complaint, a copy of the PCCS registration as a limited liability company (LLC) dated February 14, 2008, showing Clifford as the PCCS resident agent, and three written statements made by defendants to the Wayne County Prosecutor's Office Mortgage and Deed Fraud Task Force: one statement made by Clifford, dated March 11, 2011, and two statements made by Mary, dated March 11, 2011, and June 20, 2011, respectively.

## II. EXPERT WITNESS TESTIMONY

Clifford first argues that the trial court abused its discretion by refusing to allow his expert, Richard Woonton, to testify that, in his opinion, a fraud was committed by someone, but it was possible that defendants could have been unaware of the fraud. Clifford claims that he was deprived of his right to present a defense by the court's limitation of his expert's testimony. This claim is without merit.

Defendants moved before trial to qualify Woonton as an expert witness and the court qualified him as an expert in mortgage procedures. The trial court ruled, however, that Woonton could not testify regarding his opinion of whether someone could have committed fraud without defendants' knowledge. The issue regarding Woonton's qualifications is therefore preserved for appellate review. *People v Connor*, 209 Mich App 419, 422; 531 NW2d 734 (1995). However, Clifford never argued that he was deprived of his right to present a defense by the trial court's decision to limit Woonton's testimony. Therefore, that aspect of this issue is not preserved. *People v Buie (On Remand)*, 298 Mich App 50, 70-71; 825 NW2d 361 (2012) (defendant objected on one ground, but failed to object on two other grounds so those claims were not preserved). "[A] trial court's decision to admit or exclude expert testimony is reviewed for an abuse of discretion." *People v Dobek*, 274 Mich App 58, 93; 732 NW2d 546 (2007). "The trial court abuses its discretion when its decision falls outside the range of principled outcomes or when it erroneously interprets or applies the law." *People v Lane*, 308 Mich App 38, 51; 862 NW2d 446 (2014). We review unpreserved constitutional claims for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 752-753, 764; 597 NW2d 130 (1999).

At a pretrial hearing, Woonton described his background in the banking industry. He explained how mortgage closings operate and testified that he had attended mortgage closings. He admitted that he had not worked for Wells Fargo, but he insisted that he was familiar with their policies and procedures. He admitted that he had never been a mortgage fraud investigator, although he had worked with the F.B.I. fraud investigation unit. Based on his statements under oath, Woonton's testimony could be summarized as follows: his review of the documents and his knowledge of proper mortgage procedures led him to believe that people other than the Staffords arranged this fraud, and he did not *think* that the Staffords were involved because they did not get a lot of money out of the fraud and they did not keep all of the money they received during the transaction for themselves, but instead paid some of it out to other people. The trial court ruled that it would allow Woonton to testify as an expert to explain the transaction that took place, but would not permit him to address "whether or not the Staffords committed the crimes they're charged with" or "whether or not anyone else in the scene committed fraud." Clifford argues that the trial court abused its discretion by limiting Woonton's testimony.

-3-

MRE 702 set forth the standards applicable to expert testimony and states the following:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

MRE 704 provides that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." The trial court performs a "gatekeeper" role by making the initial decision whether a proposed expert witness is qualified to offer testimony and whether that testimony would be reliable. *People v Bynum*, 496 Mich 610, 625; 852 NW2d 570 (2014). "As the rule itself makes clear, however, such testimony must be 'otherwise admissible,' thereby implicating, *inter alia*, the 'helpfulness' requirement." *People v Smith*, 425 Mich 98, 107; 387 NW2d 814 (1986).

Clifford has failed to explain how Woonton's excluded testimony, which he essentially concedes amounted to a speculative belief based on the documents he was shown, was a proper opinion for an expert witness to offer or how it was relevant to the charges against defendants. As the trial court reasoned, there is simply nothing about the witness's proposed testimony that required *expert* testimony. Moreover, when he testified at trial, it turned out that Woonton had not been given all the relevant documents to review. Woonton also admitted he was not present at the closing on December 5, 2007. Therefore, Woonton's proposed testimony on the ultimate issue of whether defendants participated in the fraud was not based on "sufficient facts or data." MRE 702. Nor did defendant show that Woonton "applied the principles and methods reliably to the facts of the case." *Id*. In fact, it does not appear from his testimony that Woonton applied any principles or methods to the facts; he simply decided that he could not believe that defendants had participated in the fraud because they did not profit enough. Accordingly, Woonton's testimony did not satisfy the basic requirements of MRE 702. Furthermore, Woonton's excluded testimony in essence amounted to an opinion regarding whether the Staffords committed fraud. An expert's opinion may not extend to legal conclusions, and an expert witness is not permitted to tell the jury how to decide a case. See *Carson Fischer Potts & Hyman v Hyman*, 220 Mich App 116, 122-123; 559 NW2d 54 (1996). For these reasons, the trial court did not abuse its discretion by limiting Woonton's testimony.

With regard to Clifford's claim on appeal that exclusion of Woonton's testimony deprived him of his right to present a defense, he has not established plain error. *Carines*, 460 Mich at 764. Clifford chose to testify and therefore presented his defense that he was not present at the closing on December 5, 2007, and was not involved in any fraud that might have occurred. Defendant argues that his expert should have been permitted "to testify that the fraud that occurred on December 5, 2007 could have been perpetrated without the knowledge or presence of [Clifford]." However, as Woonton inherently conceded, he was not in a position to offer this testimony because he was not present at the closing and had not reviewed all the relevant

documents. Woonton's proposed testimony also did not satisfy the requirements of MRE 702. Therefore, defendant was not deprived by the court's ruling of the right to present a defense.

## III. DENIAL OF DIRECTED VERDICT MOTION

Clifford next argues that the trial court erred by denying his motion for a directed verdict on the obstruction of justice count, which he made at the conclusion of the prosecution's case. "When reviewing a trial court's decision on a motion for a directed verdict, this Court reviews the record de novo to determine whether the evidence presented by the prosecutor, viewed in the light most favorable to the prosecutor, could persuade a rational trier of fact that the essential elements of the crime charged were proved beyond a reasonable doubt." *People v Aldrich*, 246 Mich App 101, 122; 631 NW2d 67 (2001).

In *People v Thomas*, 438 Mich 448, 455-458; 475 NW2d 288 (1991), our Supreme Court stated the following:

> Obstruction of justice is generally understood as an interference with the orderly administration of justice. This Court, in *People v Ormsby*, 310 Mich 291, 300; 17 NW2d 187 (1945), defined obstruction of justice as " 'impeding or obstructing those who seek justice in a court, or those who have duties or powers of administering justice therein.' " In *People v Coleman*, 350 Mich 268, 274; 86 NW2d 281 (1957), this Court stated that obstruction of justice is "committed when the effort is made to thwart or impede the administration of justice." While these definitions adequately summarize the essential concept of obstruction of justice, we believe they lack the specificity necessary to sustain a criminal conviction.
>
> * * *
>
> Like breach of the peace, at common law obstruction of justice was not a single offense but a category of offenses that interfered with public justice. Blackstone discusses twenty-two separate offenses under the heading "Offences against Public Justice." If we now simply define obstruction of justice as an interference with the orderly administration of justice, we would fail to recognize or distinguish it as a category of separate offenses. We find no basis for this at common law.
>
> To warrant the charge of common-law obstruction of justice, defendant's conduct must have been recognized as one of the offenses falling within the category "obstruction of justice." [Footnotes omitted.]

In *People v Vallance*, 216 Mich App 415, 418-419; 548 NW2d 718 (1996), this Court interpreted our Supreme Court's decision in *Thomas* as follows:

> The problem presented by the *Thomas* opinion is the proper interpretation of its discussion regarding obstruction of justice. Did *Thomas* limit the scope of offenses constituting "obstruction of justice" to the twenty-two offenses listed by

-5-

Blackstone? Or was the Court merely referring to Blackstone's list to illustrate the point that, at common law, "obstruction of justice" was not a single offense but rather a category of offenses?

We find nothing in the *Thomas* analysis to suggest that offenses recognized at common law as obstruction of justice are, nonetheless, not to be so considered if they are not included in the Blackstone list. Accordingly, we conclude that the Supreme Court's reference in *Thomas* to Blackstone was merely to illustrate the point that at common law, "obstruction of justice" is not a single offense, but a category of offenses that interfere with public justice. A charge of obstruction of justice was warranted if defendant's conduct would have been recognized as one of the many offenses falling within the rubric "obstruction of justice" at common law. [Quotation marks and citations omitted.]

In *People v Kissner*, 292 Mich App 526, 540; 808 NW2d 522 (2011), this Court upheld the defendant's conviction of attempted obstruction of justice. Noting that this Court had previously held in *Vallance* that obstruction of justice was not limited to the 22 offenses listed by Blackstone's Commentaries, this Court found ample evidence to support the defendant's conviction where the evidence established that he had filed a false motion and affidavit. *Kissner*, 292 Mich App at 540-541. Therefore, this Court has previously held that filing a false affidavit in a lawsuit can constitute obstruction of justice.

Defendant lists the evidence that supports his view of the case, but ignores and fails to discuss the prosecution's evidence or to consider that evidence in the light most favorable to the prosecution. Considered in the appropriate manner, the evidence established that the affidavit Clifford filed in support of the quiet title action was false. Contrary to Clifford's statement in his affidavit that he "never appeared in person at the alleged closing of 12-5, 2007," the testimony of Avis Washington established that Clifford did personally attend that closing. Further, Clifford's statements in his affidavit that he never authorized the sale of the Nautica property to Trenise Wyldon, and that he did not even know of the sale of the property to Trenise, were inconsistent with the $44,000 check, dated December 5, 2007, which was deposited into the PCCS bank account. Finally, Clifford sought to initiate a mortgage fraud complaint, and in connection with that he gave a written statement to Mary Jones in which it appears that he lied when he claimed that neither he nor Mary had attended the Nautica property closing and when he claimed that he got $312,500 to purchase the Nautica property "[f]rom the proceeds from the Farmington Hills purchase." No evidence was presented to support this claim. Instead, the prosecutor's evidence showed that the money came from the mortgage Trenise took out on the Nautica property and that this mortgage money was then used to purchase the property from the original owners.

Considered in a light most favorable to the prosecution, the evidence showed that Clifford filed a false affidavit in the quiet title action and attempted to initiate a mortgage fraud investigation based on false written statements. These acts constituted an "interference with the orderly administration of justice . . . ." *Kissner*, 292 Mich App at 540. Therefore, the trial court did not err by denying defendant's motion for a directed verdict.

## IV. SUFFICIENCY OF THE EVIDENCE

Relatedly, Clifford argues that the prosecution failed to present sufficient evidence to prove beyond a reasonable doubt that he obstructed justice. We disagree.

> Appeals regarding the sufficiency of the evidence are reviewed de novo. In reviewing the sufficiency of the evidence, this Court must view the evidence in the light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proved beyond a reasonable doubt. Juries, and not appellate courts, hear the testimony of witnesses; therefore, we defer to the credibility assessments made by a jury. It is for the trier of fact . . . to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences. The prosecution need not negate every reasonable theory of innocence, but need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant. Circumstantial evidence and the reasonable inferences that arise from that evidence can constitute satisfactory proof of the elements of the crime. We resolve all conflicts in the evidence in favor of the prosecution. [*People v Henderson*, 306 Mich App 1, 8-9; 854 NW2d 234 (2014) (quotation marks and citations omitted.]

As earlier noted, a defendant's conviction for attempted obstruction of justice can be made out based on a defendant's filing of a false motion and affidavit in a lawsuit. *Kissner*, 292 Mich App at 540. In this case, the evidence supported that Clifford filed a false affidavit and a false written statement in the course of a quiet title lawsuit and an attempt to initiate a mortgage fraud complaint. These actions involved "interference with the orderly administration of justice" and thus constituted obstruction of justice. *Id*. Clifford relies on the *Thomas* decision to argue that his actions did not constitute conduct falling within any of the offenses listed in that case from Blackstone's Commentaries. As we have noted, however, this Court has held that *Thomas* did not limit obstruction of justice to the 22 common-law offenses listed in Blackstone's Commentaries. *Vallance*, 216 Mich App at 418-419. Moreover, in *Kissner*, this Court held that attempted obstruction of justice could be established by showing that the defendant filed a false motion and affidavit in an attempt to convince a court to grant him a new trial. Because Clifford does not reanalyze the evidence in the context of this issue, but rather relies on *Thomas* as controlling authority, his failure to cite or discuss *Kissner* is fatal to his claim.

In any event, the evidence is overwhelmingly sufficient to establish Clifford's guilt of obstruction of justice. In his affidavit, Clifford swore that (1) he never authorized anyone to appear on his behalf at the December 5, 2007 closing relating to the sale of the Nautica property to Trenise, (2) he never authorized the sale of that property to Trenise, and (3) he never knew of the sale of that property to Trenise. In a written statement to Mary Jones, Clifford again claimed that neither he nor Mary attended the closing. However, in that same document, he admitted that PCCS was his company, that PCCS purchased the property, and that he entered into an agreement with the Wyldons for them to purchase the Nautica property, an admission directly contrary to his statement in his affidavit. Further, Avis Washington testified that both Clifford and Mary attended the December 5, 2007 closing, and the evidence established that Mary signed

numerous documents at that closing. Clifford testified that he was aware that sometime around December 5, 2007, a $44,000 check from Reliant Title to PCCS was deposited into the PCCS account, and he claimed that this money was used so that "[w]e paid Trenise directly either electronically or with a money order and she would make the payments on both houses because both of them [were] in her name." According to Clifford, the referenced houses were the Nautica property and a home on Country Ridge in Farmington Hills. Clifford's own testimony therefore established that, contrary to the assertions in his affidavit, he was aware of the sale of the Nautica property to Trenise. Clifford also described how it was decided that Trenise should purchase the Nautica property because she had a good credit score. This evidence established that Clifford's affidavit in support of the quiet title action filed by PCCS was false. This evidence also established that he made false assertions in his written statement to Mary Jones in order to initiate a mortgage fraud complaint against the Wyldons. Considered in a light most favorable to the prosecution, this evidence was sufficient to prove Clifford's guilt for obstruction of justice beyond a reasonable doubt.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

Clifford next argues that his trial counsel failed to provide effective assistance of counsel when he failed to object to the court's allegedly inadequate instruction concerning obstruction of justice. To establish ineffective assistance of counsel, a defendant must show that his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and that a reasonable probability exists that, without counsel's unprofessional errors, the outcome of the proceedings would have been different. *People v Russell*, 297 Mich App 707, 715-716; 825 NW2d 623 (2012). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v Washington*, 466 US 668, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

With respect to obstruction of justice, the trial court instructed the jury as follows:

[F]or obstruction of justice the People are obligated to prove the following elements beyond a reasonable doubt:

First, that the defendant knowingly assisted in presenting a document in a court proceeding.

Second, that this document was false and fraudulent.

Third, that the defendant knew that this document was false and fraudulent at the time he or she assisted in presenting it.

And, fourth, that when [the] defendant did this, he or she had the intent to impede, thwart, or interfere with the administration of justice.

Clifford contends that the fourth element in the instruction is defective considering our Supreme Court's reasoning in *Thomas*, 438 Mich at 455-456, that while the statement "obstruction of justice is 'committed when the effort is made to thwart or impede the administration of justice' . . . adequately summarize[d] the essential concept of obstruction of

-8-

justice, [the Court] believe[d] [it] lack[ed] the specificity necessary to sustain a criminal conviction." (Citation and footnote omitted.) Clifford fails to note that the *Thomas* Court *approved* of the general statement as "adequately summariz[ing] the essential concept of obstruction of justice," but merely concluded that more specificity was necessary to define the offense sufficiently to support a criminal conviction. The instruction in this case provides the specificity that *Thomas* determined was lacking in the generalized statement.

The instruction in this case lists, with specificity, the three acts defendant must be found to have done in order to have obstructed justice: (1) he had to have knowingly assisted in presenting a document in a court proceeding; (2) the document had to be false and fraudulent; and (3) he had to have known the document was false and fraudulent at the time he assisted in presenting it. Having done those specific acts, the fourth element merely adds the intent requirement: that defendant intended that the false and fraudulent document he presented in the court proceeding would impede, thwart, or interfere with the administration of justice. This instruction supplies the specificity that our Supreme Court in *Thomas* believed was "necessary to sustain a criminal conviction." Because the trial court's instruction correctly relayed the elements of the offense, any objection by defense counsel would have been futile. Counsel cannot be deemed ineffective for failing to raise a futile objection. *People v Pinkney*, 316 Mich App 450, 473; 891 NW2d 891 (2016). Clifford's ineffective assistance claim therefore fails.

## VI. JOINT TRIALS

Clifford finally argues that the trial court abused its discretion by denying his motion to sever his trial from Mary's trial. We review for an abuse of discretion a trial court's decision to join defendants for trial. *People v Hana*, 447 Mich 325, 338; 524 NW2d 682 (1994).

In his motion, Clifford speculated that it was possible that Mary might choose to testify against him at a joint trial. Although he admitted that he did not anticipate that she would do so, he claimed that if she did, "it is at this time that [his] privilege would be violated." Clifford also claimed that, because numerous documents would be admitted that contained Mary's name but not his, the jury would be confused and might conclude that, because Mary's name was on the documents, he must have had knowledge of them. Clifford further claimed that his right to remain silent could be prejudiced if evidence was submitted against Mary and the prosecution suggested that Clifford had knowledge of this evidence, because it could force him to surrender his right to remain silent in order to deny the suggestion. Finally, Clifford stated that "it would compel [him] to testify which could conceivably impact the husband-wife privilege."

Defendants were both charged with the same two offenses, false pretenses over $20,000 and obstruction of justice, and the charges were based on the same factual and documentary evidence. The court rule governing mandatory severance of trials, MCR 6.121(C), states, "On a defendant's motion, the court must sever the trial of defendants on related offenses *on a showing that severance is necessary to avoid prejudice to substantial rights of the defendant*." (Emphasis added.) In *Hana*, 447 Mich at 346, our Supreme Court explained that "[s]everance is mandated under MCR 6.121(C) only when a defendant provides the court with a supporting affidavit, or makes an offer of proof, that clearly, affirmatively, and fully demonstrates that his substantial rights will be prejudiced and that severance is the necessary means of rectifying the potential prejudice." "[F]ailure to make this showing in the trial court, absent any significant indication

-9-

on appeal that the requisite prejudice in fact occurred at trial, will preclude reversal of a joinder decision." *Id.* at 346-347.

Clifford did not submit any affidavit or offer of proof with his motion, other than his assertions that Mary *could potentially* testify against him at trial. Therefore, he failed to make the required showing. On appeal, he has failed to show that the requisite prejudice in fact occurred at the trial. At trial, Clifford chose to testify and he did not attempt to incriminate Mary; Mary did not testify and therefore could not incriminate him. Accordingly, pursuant to *Hana*, this Court may not reverse the trial court's joinder decision.

Furthermore, the marital and spousal privileges belong to the testifying spouse, not the spouse who does not testify. See MCL 600.2162(2) and (7). At trial, Mary did not testify. Neither defendant blamed the other. Clifford failed to demonstrate that there were antagonistic defenses or that his substantial rights would be prejudiced by a joint trial. On appeal, he has failed to show that any prejudice actually occurred to him at trial. Therefore, he has failed to establish that the trial court abused its discretion by denying his motion for separate trials.

## VI. CRUEL OR UNUSUAL PUNISHMENT

Mary argues on appeal that her sentence calling for a minimum of one year of incarceration for both of her convictions violated the constitutional prohibition against cruel or unusual punishment. Const 1963, art 1, § 16; US Const, Am VIII. According to the Michigan Department of Corrections Offender Tracking Information website, Mary has completed her incarceration, was paroled on February 14, 2017, and is scheduled to be discharged from parole on February 14, 2018.[2] Because Mary has completed her term of incarceration, her claim that her prison sentence violated the constitutional prohibition against cruel or unusual punishment is moot. *People v Cathey*, 261 Mich App 506, 510; 681 NW2d 661 (2004) ("An issue is moot when an event occurs that renders it impossible for the reviewing court to fashion a remedy to the controversy."). Mary argues that this issue is not moot because she is still subject "to parole conditions versus probation conditions." However, she cites no authority in support of this position and her arguments on appeal only relate to whether her *prison sentence*, not her *parole conditions*, constitutes cruel or unusual punishment.[3]

## VII. RESTITUTION

Mary also contends that the prosecution failed to prove that she owed $96,213.42 in restitution. MCL 780.766(2) provides that, when sentencing a defendant, "the court shall order . . . the defendant make full restitution to any victim of the defendant's course of conduct that

---

[2] See < http://mdocweb.state.mi.us/OTIS2/otis2profile.aspx?mdocNumber=972040 > (accessed June 30, 2017)

[3] Moreover, Mary was sentenced within the applicable sentencing guidelines range. A sentence within the guidelines range is presumptively proportionate. *People v Johnson*, 309 Mich App 22, 34; 866 NW2d 883, vacated in part on other grounds 497 Mich 1042 (2015). A proportionate sentence is not cruel or unusual. *Id.* at 35.

gives rise to the conviction or to the victim's estate." The original amount of restitution discussed at sentencing was $96,213.42. Defense counsel objected that this amount did not take into account payments that were made before the foreclosure occurred. The parties discussed some of the figures, and they were given an opportunity to jointly arrive at an appropriate amount; however, they failed to do so. The court resolved the matter by ordering a reduced amount of restitution of $75,000.[4] Defense counsel did not object; instead, he thanked the court. Defense counsel never asked to reopen the restitution inquiry and never requested an evidentiary hearing. Even though appellate counsel subsequently moved for post-sentencing relief, neither a recalculation of the amount of restitution nor an evidentiary hearing was requested.

On appeal, Mary only makes reference to the restitution amount of $96.213.42, but the final restitution amount ordered was $75,000, and Mary does not challenge this amount on appeal. Therefore, Mary has abandoned any claim of error on appeal. See *People v Iannucci*, 314 Mich App 542, 545; 887 NW2d 817 (2016) ("[F]ailure to brief the merits of an allegation of error constitutes an abandonment of the issue.") (quotation marks and citation omitted).[5]

Affirmed.

/s/ Henry William Saad
/s/ Deborah A. Servitto
/s/ Michael F. Gadola

---

[4] The court explained that if defense counsel could demonstrate that the amount should be even lower than $75,000, it would allow a restitution hearing to address the matter.

[5] Even if we were to review this issue for plain error, Mary has not established that any error occurred. "[T]he court is entitled to rely on the amount recommended in the presentence investigation report, which is presumed to be accurate unless the defendant effectively challenges the accuracy of the factual information." *People v Gahan*, 456 Mich 264, 276 n 17; 571 NW2d 503 (1997), overruled on other grounds by *People v McKinley*, 496 Mich 410, 424 (2014) (quotation marks and citation omitted). Because Mary failed to effectively challenge to the accuracy of the PSIR in the trial court, the prosecution was not put to the task of proving that its figures were correct. The PSIR recommended a restitution amount of $96,213.42, and the trial court was permitted to rely on that figure.